**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | |
| MAGNA ENTERTAINMENT CORP., et al., ) ) | Case No. 09-10720 (MFW) |
| ) | (Jointly Administered) |
| Debtors. ) | |
| _____ ) | |
| ) | |
| MAGNA ENTERTAINMENT CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Adversary No. 09-52212 (MFW) |
| v. ) | |
| ) | |
| PA MEADOWS, LLC, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**OPINION**[1]

Before the Court are the Cross Motions for Summary Judgment filed by Plaintiff, Magna Entertainment Corp. ("MEC") and by Defendant, PA Meadows, LLC ("PAM") on the Complaint filed by MEC seeking payment under a Holdback Agreement between the parties. For the reasons set forth below, the Court will deny MEC's Motion and grant PAM's Motion for summary judgment.

I. BACKGROUND

MEC was the leading owner and operator of racetracks in North America. (Tohana Decl. at ¶¶ 4-5.) PAM is a subsidiary of

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

MezzCo, LLC ("MezzCo"), which is in turn a subsidiary of Cannery Casino Resorts, LLC ("CCR"). (Singer Aff. at Ex. B.)

In 2005, MEC and PAM executed a stock purchase agreement pursuant to which PAM bought all of the stock in three subsidiaries of MEC which owned and operated the Meadows Racetrack in Pennsylvania. (Tohana Decl. at ¶ 6; Singer Aff. at Ex. C.) PAM paid the purchase price of $200 million in two promissory notes. (Tohana Decl. at ¶ 9.) After the Meadows Racetrack received a gaming license, in November 2006, PAM paid the $175 million note in full and the $25 million note was replaced by a Holdback Agreement. (Tohana Decl. at ¶ 10 & Ex. A.)

The Holdback Agreement (dated November 14, 2006) provided that the remaining $25 million would be paid in five annual installments commencing on the later of February 15, 2008, and the Holdback Trigger Date (defined as the date that a permanent casino opens at the Meadows).[2] (Tohana Decl. at Ex. A, § 2.03.) The payment of the installments was subject, however, to there being Available Excess Cash Flow under the Meadows Credit Agreements for the prior fiscal year. (Id. at Ex. A, § 2.04(a).) The Holdback Agreement permitted PAM to incur additional debt to finance the casino and to enter into new, amended or restated credit agreements so long as PAM used its best efforts to obtain

---

[2] The permanent casino opened at the Meadows on April 15, 2009. (Lettero Decl. at ¶ 5; Singer Aff. at Ex. Q.)

2

terms that do not have more restrictive definitions of Excess Cash Flow than the terms of the original Meadows Credit Agreements. (Id. at Ex. A, § 3.04(a).) In addition, the Holdback Agreement provided that PAM would pay all accrued installments before MezzCo could receive any proceeds from the sale of any equity or assets of PAM. (Id. at Ex. A, § 3.03(b).)

On or about May 18, 2007, CCR entered into a new global financing for all its entities, on which PAM was a guarantor, resulting in the termination of the Meadows Credit Agreements. (Lettero Decl. at ¶¶ 7-14; Singer Aff. at Ex. A, pp. 84-88.) About the same time, CCR entered into negotiations with an Australian corporation, Crown Limited ("Crown"), which was interested in acquiring CCR for an expected price of $1.7 billion. (Lettero Decl. at ¶¶ 15-18; Singer Aff. at Ex. A, pp. 157-58.) When the parties were not able to get the requisite approvals, they closed on a different deal on March 12, 2009, pursuant to which Crown purchased less than half of the equity in CCR for $320 million. (Lettero Decl. at ¶¶ 15-18; Singer Aff. at Ex. A, pp. 164-65, 170-72.)

On March 5, 2009, MEC and several of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On September 29, 2009, MEC commenced the instant adversary proceeding by filing a complaint against PAM, MezzCo and CCR. On October 12, 2009, MEC filed an Amended Complaint. MezzCo and CCR filed motions to dismiss and MEC voluntarily dismissed those

defendants without prejudice.  In its Amended Complaint, MEC is seeking damages for breach of the Holdback Agreement as a result of PAM's failure to pay $10 million which MEC alleges was due April 15, 2009, and seeking a mandatory injunction requiring PAM to make all future payments due under the Holdback Agreement.

II. <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(1), which is a core matter pursuant to 28 U.S.C. § 157(b)(2)(E), (M), and (O).

III. <u>DISCUSSION</u>

    A. <u>Standards for Summary Judgment</u>

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings.

In considering a motion for summary judgment under Rule 56, the court must view the inferences from the record in the light most favorable to the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Hollinger v. Wagner Mining Equip. Co.</u>, 667 F.2d 402, 405 (3d Cir. 1981).  If there does not appear to be a genuine issue as to any material fact and on such facts the movant is entitled to judgment as a matter of law, then the court shall enter judgment in the movant's favor.  <u>See, e.g.</u>,

Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 413 (3d Cir. 1990).

The movant bears the burden of establishing that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986); Integrated Water Res., Inc. v. Shaw Envtl., Inc. (In re IT Group, Inc.), 377 B.R. 471, 475 (Bankr. D. Del. 2007). A fact is material when it could "affect the outcome of the suit." Anderson, 477 U.S. at 248.

Once the moving party has established a prima facie case in its favor, the party opposing summary judgment must go beyond the pleadings and point to specific facts showing more than a scintilla of evidence that there is a genuine issue of fact for trial. See, e.g., Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 585-86; Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir. 2000); Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 164 (3d Cir. 1999).

B. Contract Interpretation

In this case, both parties seek summary judgment based on the plain language of the Holdback Agreement. "It is the Court's duty to interpret a written contract as a matter of law where it is unambiguous and the intent of the parties is discernible from the four corners of the agreement." Rakus, Inc. v. 3 Red G, LLC,

No. 16594/09, 2010 WL 26252, at *7 (N.Y. Sup. Ct. 2010).[3]

    C.    <u>Violation of Holdback Agreement</u>

MEC contends that PAM is in violation of the Holdback Agreement by failing to pay at least $10 million allegedly due thereunder and seeks summary judgment in that amount plus a mandatory injunction requiring PAM to make future payments as required under the Agreement. PAM denies that any payments are currently due under the express language of the Agreement.

    1.    <u>Crown acquisition</u>

Initially, MEC contends that the Crown transaction triggered an obligation by PAM to pay all holdback installments owing at the time (which it asserts is $10 million).[4] PAM argues that under the plain language of the Holdback Agreement, the Crown acquisition did not trigger any obligation to pay any of the holdback amounts.

The Court agrees with PAM. The provision in the Holdback Agreement on which MEC relies states in relevant part that

> [PAM] agrees that prior to the receipt by MezzCo of any
> . . . MezzCo Sale Proceeds . . . [PAM] shall pay [MEC]
> in cash all Accrued Amounts and make adequate provision
> that is reasonably satisfactory to [MEC] and [PAM] for
> the payment of all amounts that will become due to
> [MEC] hereunder . . . .

---

[3] The Holdback Agreement is governed by New York law. (Tohana Decl. at Ex. A, § 5.09.)

[4] MEC argues that the sale of equity triggers the obligation to pay the holdback amounts regardless of whether there is Available Excess Cash Flow. (Tohana Decl. at Ex. A, § 2.04.)

6

(Tohana Decl. at Ex. A, § 3.03(b).)  MezzCo Sale Proceeds are defined as

> any payments (whether in the form of cash, securities, other assets, non-compete payments, earn-out payments, or fees or compensation) paid by any Person, other than MezzCo, to MezzCo in connection with such Person's purchase from MezzCo of any equity interest in, or asset of, [PAM] or any of its subsidiaries.

(Id. at § 1.01.)

The Court finds that the language of the Holdback Agreement is unambiguous and requires that there be a sale of assets or equity of PAM or its subsidiaries, not assets or equity of CCR, to trigger the payment obligation.  In this case, there was no sale of any assets or equity of PAM or PAM's subsidiaries.  The sale to Crown was of equity in CCR, the parent of MezzCo and grandparent of PAM.  (Spiegel Decl. at Exs. 7 & 10, p. 53.) Therefore, the Court concludes that the sale of equity in CCR does not fit within the plain language of the contract and did not trigger any obligation to pay anything under the Holdback Agreement.

Both MEC and PAM are sophisticated parties and are bound by the terms of the agreement they signed.  See, e.g., Riverside South Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y. 2009) (holding that where a contract is unambiguous it will be enforced according to its terms and courts may not add or excise terms); TAG 380, LLC v. ComMet 380, Inc., 10 N.Y.3d 507, 512-13 (N.Y. 2008) (stating that "it is a basic

contract principle that 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms'") (quoting Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (N.Y. 1990)); Reiss v. Fin. Performance Corp., 764 N.E.2d 958, 961 (N.Y. 2001) (holding that parties were bound by their agreement and refusing to imply a term where the contract could be interpreted without it); Master-Built Constr. Co. v. Thorne, 802 N.Y.S.2d 713, 714 (N.Y. App. Div. 2005) (holding that when contractual language is unambiguous, the objective of the court is "to determine the parties' intention as derived from the language that [they] employed in the contract.") (quoting Katina, Inc. v. Famiglietti, 761 N.Y.S.2d 327, 329 (N.Y. App. Div. 2003)).

MEC contends, however, that MezzCo is defined to include all its affiliates so that the receipt of cash by CCR from Crown is the same as the receipt of cash by MezzCo and, therefore, constitutes MezzCo Sale Proceeds. (Tohana Decl. at Ex. A, § 1.01.)

MEC's argument must be rejected. While MezzCo is defined to include its subsidiaries, the Holdback Agreement specifically states that the cash received must be as a result of a sale of assets or stock of PAM or PAM's subsidiaries, not a sale of stock in an affiliate of PAM. (Tohana Decl. at Ex. A, §§ 1.01 & 3.03(b).) The cash received by CCR from Crown was from the sale of CCR stock not the sale of any stock or asset of PAM or a

8

subsidiary of PAM.

MEC argues further that the purpose of the Holdback Agreement was frustrated here. It contends that the purpose of the Holdback Agreement was to prevent CCR from profiting from a sale of its interest in PAM without paying MEC. In this case, MEC alleges that the sale of CCR equity to Crown violated the Holdback Agreement because it was premised on the value of PAM, which of the four properties owned by CCR was the most profitable and clearly was the reason CCR entered into the deal.[5]

PAM responds that the plain language makes it clear that only a sale of equity in PAM or its subsidiaries triggers the payment obligation. PAM objects to the consideration of the "purpose" of the Holdback Agreement, because the language is clear and unambiguous.

The Court agrees with PAM. The language of the Holdback Agreement is plain and unambiguous. Further, what Crown intended in acquiring the stock in CCR is irrelevant. Courts are not to consider parol evidence of the intent of the parties in interpreting a contract. See, e.g., Halkedis v. Two East End Ave. Apartment Corp., 525 N.Y.S.2d 31, 32 (N.Y. App. Div. 1988) (holding that arguments as to the "real intent" of the parties cannot contravene the express intent set forth in the written

---

[5] As evidence of the importance of PAM to Crown, MEC notes that of the $320 million paid by Crown, $20 million was directly used in the construction of the Meadows casino. (Singer Aff. at Ex. A, pp. 170-73.)

9

agreement); Citicorp Servs., Inc. v. Hussain, 541 N.Y.S.2d 168, 169 (N.Y. Sup. Ct. 1989) (holding that parol evidence of any alleged understandings may not be introduced to contradict, vary or alter the express terms of contracts). In this case MEC asks the Court to do even more: to consider the subjective intent of two non-parties (Crown and CCR) in entering into an unrelated agreement to determine the meaning of the unambiguous Holdback Agreement. This the Court cannot and will not do.

MEC argues, in addition, that the sale of CCR equity was an "indirect" sale of PAM which triggers the payment obligation under section 3.03 of the Holdback Agreement. Again it points to the significance of the PAM assets in Crown's decision to invest in CCR.

PAM responds, however, that an indirect sale is not covered by section 3.03. It notes that where the parties intended that an indirect entity or affiliate was meant, that term was used. (Tohana Decl. at Ex. A, § 3.04(a) (using term "direct or indirect equity owners").) In addition, PAM contends that transfers of equity in CCR were governed by other provisions of the Holdback Agreement which are not implicated in this case.[6] Therefore, PAM argues that MEC cannot use section 3.03(b) to get a result that

---

[6] The parties disagree about the exact terms of these other provisions but essentially the Holdback Agreement provides that if more than 51% of the stock of CCR is transferred, then a Payment Event would occur, which would ultimately cause the outstanding installments to become due. (Tohana Decl. at Ex. A, §§ 1.01 & 2.04(c).)

is inconsistent with (or would obviate the need for) those other provisions.

The Court agrees with PAM. The Holdback Agreement has a provision expressly dealing with the consequences of a sale of a controlling interest in the equity in CCR. (Tohana Decl. at Ex. A, §§ 1.01 & 2.04(c).) Therefore, it is not proper to use section 3.03(b) to change or eliminate the need for that provision. See, e.g., FCI Group, Inc. v. City of New York, 862 N.Y.S.2d 352, 356 (N.Y. App. Div. 2008) (holding that contract must be interpreted so that no term is rendered "mere surplusage, in contravention of the settled rule that a contract is to be construed so as to give effect to each and every part").

Lastly, MEC argues that PAM was just a corporate shell controlled by CCR without officers or directors. MEC asks the Court not to allow PAM to avoid its obligations by using "a shell game of formalism." Instead, MEC argues, the Court should find that the sale of CCR stock was really a sale of PAM equity which triggered the holdback payment obligation.

PAM responds that this is not a "shell game of corporate formalism," but a recognition that corporations are distinct legal entities. Corporation law does not permit a finding that a shareholder of a parent corporation has an ownership interest in the parent's subsidiary. See, e.g., Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003) (concluding that "[a]n individual shareholder, by virtue of his ownership of shares, does not own

11

the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest.").

The Court agrees with PAM. PAM and MezzCo and CCR are separate corporate entities and recognition of that is not simply a formalism. Id. at 475. While MEC seems to suggest that the corporate veils should be pierced, it has offered no evidence to support that thesis. See, e.g., Morris v. New York State Dept. of Taxation, 82 N.Y.2d 135, 141 (N.Y. 1993) (holding that "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."); TNS Holdings v. MKI Sec. Corp., 92 N.Y.2d 335, 339-340 (N.Y. 1998) (refusing to pierce corporate veil where, even if sister and parent corporation dominated other subsidiary, there was no evidence that the domination was used to perpetrate a fraud on the plaintiff).

Therefore, MEC has failed to sustain its burden on this point necessary to grant its motion for summary judgment. See, e.g., Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (holding that if a party moving for summary judgment offers only speculation and conclusory allegations, its burden is not met).

2.  Refinancing of PAM

MEC also asserts that the opening of the casino at the Meadows triggered the payment of two installments totaling $10 million. Under the Holdback Agreement, the annual installments were due to begin on the later of the Holdback Trigger Date or February 15, 2008. (Tohana Decl. at Ex. A, § 2.03.) The Holdback Trigger Date was defined as the date the permanent casino opened at the Meadows, which occurred on April 15, 2009. (Id. at § 1.01; Singer Aff. at Ex. Q.)

PAM responds that the payment obligation under section 2.03 was premised on the ability of PAM to make those payments and therefore was payable "only in the amount and to the extent of Available Excess Cash Flow." (Tohana Decl. at Ex. A, § 2.04(a).) Available Excess Cash Flow was calculated by reference to the Meadows Credit Agreements with Bank of America dated 2006. (Id. at Exs. B & C, p. 14.) PAM notes that nowhere does MEC contend that PAM has had Available Excess Cash Flow as defined by those agreements. In fact, PAM contends that there had been no Available Excess Cash Flow. (Lettero Decl. at ¶ 5 & Exs. B, G, H, I & J.)

MEC argues, however, that the limitation on payments to Available Excess Cash Flow has been eliminated because PAM terminated the Meadows Credit Agreements with Bank of America when CCR did a global refinancing in May 2007. (Singer Aff. at Exs. I & J.)

13

PAM disagrees, contending that the Holdback Agreement contemplated that the Meadows Credit Agreements would be refinanced, because they were insufficient to allow PAM to build the permanent casino (which as noted above had to occur before any payments under the Holdback Agreement were due to MEC). (Tohana Decl. at Ex. A, § 2.03; Singer Aff. at Ex. A, pp. 78, 81-82.). There is nothing in the Holdback Agreement which precludes PAM from refinancing, but it does provide some protection to MEC in the event that PAM does refinance. In this regard, the Holdback Agreement provides that

> [PAM] agrees that in the event that either (i)(A) it incurs additional debt to finance the construction of the permanent Meadows Casino Facility or refinances the debt outstanding under the Meadows Credit Agreements, and enters into new, amended or restated credit agreements in connection therewith . . . [PAM] will use its best efforts to obtain and maintain terms for the Meadows Credit Agreements that: (A) provide for an excess cash flow definition no more restrictive than is applicable to it under the Meadows Credit Agreements . . . provided, however, the term "best efforts" as used in this Section 3.04(a) shall not require PAM or its direct and indirect equity owners to commit additional funds or incur additional expense.

(Tohana Decl. at Ex. A, § 3.04.) Therefore, PAM argues that the only obligation it had was to use its best efforts to assure that the definition of Available Excess Cash Flow was not more restrictive in the refinancing than in the original Meadows Credit Agreements. It notes that MEC has not argued (or presented any evidence) that PAM did not use its best efforts in this regard. In contrast, PAM has presented evidence that it did

14

use its best efforts to get acceptable terms in the replacement financing to allow it to build the permanent casino. (Lettero Decl. at ¶¶ 7-12.)

MEC responds that the Holdback Agreement allowed PAM to refinance but that is not what happened here; instead, MEC notes that CCR refinanced. The Court rejects this argument. Even if this is the case, there is nothing in the Holdback Agreement that precludes CCR from refinancing or that mandates repayment of the holdback amount if CCR does refinance.

MEC argues nonetheless that the refinance by CCR resulted in the termination of the Meadows Credit Agreements and that, therefore, there are no Available Excess Cash Flow restrictions on the payment of the holdback. PAM disagrees, noting that PAM is a guarantor (and a Loan Party) under the new credit facility, thereby making the latter a replacement facility under the Holdback Agreement. (Singer Aff. at Ex. S; Bray Decl. at Exs. 2 & 22.)

The Court agrees with PAM. The Meadows Credit Agreements are defined in the Holdback Agreement as

> the First Lien Credit Agreement of [PAM], dated as of November 14, 2006, . . . as it may be replaced, amended, supplemented or otherwise modified from time to time . . . and the Second Lien Credit Agreement of [PAM], dated as of November 14, 2006, . . . as it may be replaced, amended, supplemented or otherwise modified from time to time . . . .

(Id. at § 1.01.) In this case, PAM replaced the Meadows Credit Agreements with the global credit agreements executed by CCR on

15

which PAM was a guarantor and under which PAM was able to obtain the cash necessary to complete the construction of the casino at the Meadows. (Singer Aff. at Exs. I, J & S.) There is nothing in the Holdback Agreement that precludes this. Further, as noted by PAM, the Holdback Agreement did not require that PAM be a borrower under the replacement credit agreement; the new facility simply had to be a replacement of the original facility. In this case, PAM is a guarantor and loan party under the new credit facility. (Singer Aff. at Ex. S; Bray Decl. at Exs. 2 & 22.) Therefore, the Court concludes that the new credit facility is a replacement facility for the Meadows Credit Agreements.

MEC argues, however, that the new global financing was worse than the original Meadows Credit Agreements because it was premised on the cash flow of all the properties owned by CCR and because it permitted the deduction of voluntary prepayments of debt and all capital expenditures of CCR and its subsidiaries. (Singer Aff. at Exs. G & K.) MEC contends that PAM was the most profitable subsidiary and that including the results from the other subsidiaries of CCR would substantially diminish its excess cash flow. (Id.) PAM contests this assertion and argues that in critical aspects the two credit facilities are not significantly different. (Lettero Decl. at ¶ 14.)

The Court finds it unnecessary to decide this issue because the actual terms of the replacement credit agreements are irrelevant. The only obligation PAM had under the Holdback

Agreement was to use its best efforts to get terms that were not more restrictive than the original Meadows Credit Agreements. MEC has offered no evidence that PAM did not use its best efforts. In contrast, PAM points to the analysis that it provided to MEC at the time of the refinance which showed that it would improve PAM's ability to make the holdback payments. (Id. at ¶ 12 & Ex. D; Singer Aff. at Ex. H.) As a result, the Court concludes that PAM has established that it used its best efforts in negotiating the replacement credit facility to assure that it protected MEC's rights to payment of the holdback.

Therefore, the Court concludes that MEC has not established that it is entitled to summary judgment, while PAM has established that it is entitled to summary judgment in its favor on the Amended Complaint.

IV. CONCLUSION

For the foregoing reasons, the Court will deny MEC's Motion for summary judgment and grant PAM's Motion for summary judgment.

An appropriate Order is attached.

Dated: February 9, 2011                BY THE COURT:

                                       Mary F. Walrath
                                       United States Bankruptcy Judge